IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHAPAL ZENRAY, INC.,
a Texas Business Corporation,

        Plaintiff,

                                       CIVIL ACTION NO.

v.

STEVE HARPER, STONEWEAVER, INC.
a New Mexico Business Corporation,
FRANK LENTE, JACKIE ELKINS,
NO. 8 MINE, LLC, and #8 LLC,

        Defendants.

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

      Chapal Zenray, Inc., by its attorneys, SaucedoChavez, P.C., and Cory Johnson, Attorney-At-Law, for its Complaint, alleges as follows:

**<u>PARTIES</u>**

      1.      Plaintiff Chapal Zenray, Inc. ("Plaintiff" or "Chapal") is a Texas corporation with its principal place of business at 4435 Spring Valley Road, Dallas, Texas.

      2.      Defendant Stephen "Steve" Harper is a resident of Gallup, New Mexico doing business at 308 S. 3RD St Gallup, New Mexico 87301.

      3.      Stoneweaver, Inc. is a New Mexico Corporation with its principal place of business at 308 S. 3RD St Gallup, New Mexico 87301.

      4.      Defendant Frank M. Lente is a resident of Gallup, New Mexico doing business at 3702 Bonito Court, Gallup, New Mexico 87301.

      5.      Jackie Elkins is a resident of New Mexico doing business at 608 Dalies Ave, Belen, NM 87002.

6.      No. 8 Mine, LLC is a Delaware limited liability corporation.  No. 8 Mine, LLC's registered agent is National Registered Agent, Inc. located at 160 Greentree Dr. Ste 101, Dover, Delaware 19904.

7.      #8 LLC is a New Mexico limited liability corporation.  #8 LLC's registered agent is Jack ("Jackie") Elkins located at 608 Dalies Ave, Belen, NM 87002.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a).  The action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391(a)(2).  This is the District in which a substantial part of the events or omissions giving rise to the claims asserted herein occurred.

## Factual Allegations

10.     Chapal is a manufacturer, wholesaler, and retail seller of jewelry, including turquoise and other opaque stone jewelry.

11.     On or around September 2016, Chapal's CEO, John House, was introduced to Defendant Frank Lente d/b/a/ "Wild Horse" ("Lente") from Gallup, New Mexico, who held himself out as supplier of rough material that was highly skilled in the opaque stone market.

12.     In September 2016, Lente sold Chapal several hundred pounds of rough material, such as campitos, campo freo, and nackosari turquoise for $13,620.00.

13.      "Rough" opaque materials are unrefined and uncut rock containing the desired precious minerals, such as turquoise, that are used in jewelry.

14.     Depending on certain factors such as hardness, the rough is sometimes treated with hardening resins, then cut into various sized and graded blocks and cabochons for jewelry production.

15.     During that time, Lente communicated to House and other individuals working for Chapal that he was an expert in rough material with years of experience locating and supplying various opaque rough to jewelry makers and wholesalers.

16.     From September 2016 through January 2017, Chapal paid Lente more than $100,000 to locate and supply several thousand pounds of rough material.

17.     In January 2017, Chapal agreed to pay Lente to act as its purchasing agent for locating and buying opaque rough to fulfill current and future purchase orders from Chapal's wholesale jewelry buyers—as well as to find strategic opportunities for Chapal and its owners to benefit from.

18.     Lente told Chapal that, based on his expertise, he could find the "best quality" rough for the "best prices."  Lente represented that he would find Chapal special deals and would work exclusively for Chapal in consideration for $10,000 a month plus incurred expenses.

19.     During that time, Chapal was seeking to expand its sales of high end turquoise jewelry and needed to purchase 50 to 75 pounds of a specific type of turquoise, "No. 8 Turquoise," to fulfill a specific purchase order from one of Chapal's largest customers, The Evine Shopping Network ("Evine").  "No. 8 Turquoise" came from a specific mine called the "No. 8 Mine" located in Nevada.

20.     The No. 8 Turquoise had to be timely acquired in order for Chapal to timely fulfill its contractual obligations to Evine, which planned to feature the No. 8 Turquoise jewelry on an upcoming television shopping program.

3

21.     Lente informed Chapal that the supply of No. 8 Turquoise was very limited and would be difficult to find, but that he could supply the rough for $150.00 per pound.   Chapal advanced Lente $11,000.00 to procure the material.

22.     Lente represented that there was material in a warehouse in Nevada where he would procure the No. 8 Turquoise.   Lente represented that he travelled to Nevada but was unable to locate the material.

23.     Lente then represented that he located a supplier in California who had enough material to complete the Chapal order.   Chapal paid Lente to travel to California to examine the rough.   Lente told Chapal that the rough was "crap."

24.     Lente then advised Chapal that he knew of a custom jeweler who had been in business making custom jewelry for decades who was sitting on a supply of handpicked No. 8 rough.

25.     Lente represented that the rough was hand selected by the jeweler himself and that it was used in the jeweler's custom jewelry.   Lente further stated that he had heard that the jeweler was looking to wind down and maybe would consider selling some of his No. 8 stock. The jeweler Lente was referring to was Defendant Steve Harper.

26.     Lente, however, failed to disclose that Steve Harper had been his longtime friend and business consociate.

27.     Steve Harper and his company, Stoneweaver Inc. ("Stoneweaver") design, manufacture and sell custom jewelry in Gallup, New Mexico.

28.     Lente told Chapal that Steve Harper was an expert in turquoise and that he had a "private stash" of "select handpicked" No. 8 Turquoise that was the "best of the best."

29.     In a subsequent conversation, Lente told Chapal that Steve Harper would sell his supply of No. 8 Turquoise for $150 a pound on the condition that Chapal agreed to buy his entire supply—approximately 2000 lb.

30.     In early February 2017, Chapal contacted Steve Harper about purchasing his supply of No. 8 Turquoise; Steve Harper echoed Lente's communications to Chapal.

31.     Specifically, Steve Harper told House (1) that he held approximately 2000 lb. of rough No. 8 Turquoise in his storage facility, (2) that Chapal would have to buy his entire supply, (3) that he was an expert in No. 8 Turquoise, (4) that there was a very limited supply of No. 8 Turquoise, and (5) that his supply was "high quality" rough that he had "hand selected" from the last turquoise material sourced from the No. 8 Mine.

32.     Steve Harper offered to sell his entire supply at $150 per pound.

33.     Based on Steve Harper's and Lente's representations, Chapal wired Stoneweaver a $20,000 good faith payment towards the purchase of 2000 lb. of No. 8 Turquoise on February 3, 2017.

34.     House asked to visit Steve Harper's storage facility, but Harper refused and said that he would bring his supply to the shop owned by his son, Bryan Harper.

35.     Importantly, House told Lente that Chapal's wholesale customers were interested in creating specific turquoises brands to sell through Evine's and other wholesale customers' home shopping network channels and that it was Chapal's plan to create a No. 8 Turquoise brand.   House specifically told Lente to keep this information confidential when locating suppliers of No. 8 Turquoise.

36.     On February 11, 2017, House traveled to Gallup, New Mexico to meet with Steve Harper and Lente to discuss the terms of the agreement.  At the meeting, Steve Harper showed House four rows of buckets that Steve Harper said contained *4000 lb.* of No. 8 Turquoise.

37.     House was surprised by the amount of Steve Harper's supply, which was now double the size of his original representation.

38.     Steve Harper explained that there was more in his storage than he thought, but the deal required that Chapal purchase "all that he had."

39.     House informed Steve Harper that Chapal would be willing to purchase the entire 4000 lb. supply, but would only purchase the original 2000 lb. now. The remaining amount would be purchased pursuant to another schedule to be agreed by the parties at a later date.

40.     House asked Steve Harper and Lente about the $150 per pound price.  Harper explained that it was $120/lb. for the rough, $20/lb. commission to Lente, and $10/lb. would be paid for "stabilization"[1] of the rough material.

41.     Lente recommended Defendant Jackie Elkins ("Elkins") to perform the stabilization.

42.     Both Lente and Steve Harper communicated that there was hard turquoise that would not need stabilization or would otherwise be enhanced using a process not offered by Elkins.  Because Chapal already had an exclusive agreement with Lente and some of the turquoise would not need stabilization, House said Chapal would pay Lente and Elkins pursuant to a separate agreement as material was delivered and/or stabilized.

---

[1] Stabilization is the process of soaking the rough in resin to harden them so that they can be cut into blocks and cabochons.  Cabochons are the finished gemstones that have been shaped and polished.

43.     Accordingly, on February 11, 2017, Chapal agreed to pay Stoneweaver only $120/lb. for the first 2000 lb.—total $240,000. The parties agreed to separate payments of $100K on February 13, 2017, $120K seven days later, plus the previous $20K payment. House also agreed to pay Stoneweaver $240K for the remaining 2000 lb., with the payment schedule and shipment dates to be agreed upon within 60 days.

44.     In the signed invoice, Steve Harper explicitly acknowledged that the turquoise would be released to "Chapel Agent" Frank Lente. *See* Stoneweaver Invoice, dated February 11, 2017 attached hereto as Exhibit A.

45.     Chapal and Lente agreed that he would be paid $10,000 per month for his continued services as an exclusive purchasing agent tasked with locating and negotiating Chapal's purchase of opaque materials and opportunities related to the mining or procurement of materials.

46.     Chapal and Elkins agreed that he would be paid $6 per pound to perform stabilization and to assist Lente negotiating the purchase of or production of materials on behalf of Chapal.

47.     Chapal wired Stoneweaver $100,000 on or about February 14, 2017.

48.     On February 15, 2017, Steve Harper selected and released 800 lb. of rough material from his supply to Lente. Lente then delivered the 800 lb. to Jackie Elkins for stabilization.

49.     On or about February 24, 2017, Chapal paid Stoneweaver $120,000 for a total payment of $240,000.

50.     Following Elkins's stabilization, approximately 300 lb. of the material selected by Steve Harper was sent to Chapal's Thailand factory for cutting with the remaining 500 lb. sent to Ryan Faust of Sterling Turquoise for cutting.

51.     Recently, Ryan Faust informed Chapal that the vast majority of the material sent to Sterling Turquoise was worthless and not capable of being cut into turquoise gemstones.  The Thailand factory also found that the material it received was largely unsuitable for making into turquoise jewelry.

52.     In March 2017, Lente traveled to Baja Mexico to meet with another supplier of turquoise, Carlo Muniz.  Acting as its exclusive agent, Chapal paid Lente's travel costs to Mexico and expected him to negotiate a deal on behalf of Chapal.

53.     Unbeknownst to Chapal, Lente, in direct coordination with Steve Harper, met with the supplier and attempted to negotiate a deal on behalf of Steve Harper and Stoneweaver. Steve Harper texted Muniz, "Goodmorning [sic] Carlo.. my partner Frank [Lente] will be in El Rosario… and would like to meet with you and see what we can work out with turquoise.. can you give me contact information so he can set up a meeting?"

54.     While trying to secure a deal for Steve Harper, Lente falsely represented to House that no deal could be reached between Carlo Muniz and Chapal.  Carlo Muniz ultimately rejected Steve Harper's proposal and would several months later show House the text messages from Steve Harper.

55.     In April 2017, Chapal paid for Steve Harper's son, Bryan Harper, to travel to Chapal's Thailand factory to oversee some of the cutting and production of the No. 8 Turquoise jewelry.

56.     House traveled to Thailand and met with Bryan Harper.   The two discussed Chapal's agreement to buy the entire 4000 lb. of Stoneweaver's supply of No. 8 Turquoise.

57.     Bryan Harper revealed to House that his father, Steve Harper, had not sold the entire supply and had, in fact, kept an additional 800 to 1000 lb. of hard, high grade No. 8 Turquoise for himself that consisted of large nuggets and boulders.  According to Bryan Harper, this amount was above the 4000 lb. amount Steve Harper had represented as his total supply of No. 8 Turquoise that Chapal was induced into purchasing.

58.     Bryan Harper also told House that Chapal's purchase was only for low quality "mine run"[2] rough.   House responded that whether or not it was "mine run" material was irrelevant, because Steve Harper and Lente had represented to him that the material was "high quality" rough sorted and "hand selected" by Steve Harper.

59.     Concerned, House returned home and instructed Lente to go to the Harpers' storage facility and pick up another 1200 lb. of the absolute best material of what was remaining, which Chapal had already paid for.

60.     According to Lente, he went to Bryan Harper's shop, where the material was located, to pick up 1200 lb. of No. 8 Turquoise, but Bryan Harper refused to give Lente any material.

61.     To date, Chapal has never received from Stoneweaver the 1200 lb. balance of No. 8 Turquoise that Chapal had, in fact, already paid for pursuant to the parties' original agreement.

62.     House made plans to travel to Gallup to confront Steve Harper directly regarding whether Chapal had been sold the entire supply, what the Harpers had withheld, and confirm Chapal's understanding of the agreement.

---

[2] House would later discover that the industry definition of "mine run" generally means the unsorted product from a mine.

63.     However, before the meeting with Steve Harper, Lente informed House that there was another individual, Paul Sugar, who owned 10,000 lb. of No. 8 Turquoise that he was willing to sell for $50 per pound.

64.     Armed with this new information from Bryan Harper and Lente, House met with Steve Harper.  Harper admitted that he had held back on selling an additional 800 to 1000 lb. of his highest quality turquoise.

65.     House then demanded the return of Chapal's $240,000 payment less the true value of the 800 lb. already received.

66.     Steve Harper refused, saying that that "was not going to happen" and that the money was gone.

67.     Steve Harper also informed House that it was "illegal" for Sugar to sell his supply because of a prior lawsuit involving an individual named Elven Jennings that had purportedly enjoined Sugar and other parties from selling No. 8 Turquoise.  *See* Case No. 3:07-cv-00230-LRH-RAM, *Elven Jenning et al. v Fay Ward et al.*, United States District Court, Nevada.

68.     Lente also told House that Steve Harper and Jennings were the only ones who could legally sell No. 8 Turquoise.

69.     Based on Steve Harper's inability to return its money and Chapal's immediate need for No. 8 Turquoise, House negotiated a settlement in which Steve Harper would sell the entire supply (approximately 4800 to 5000 lb.) to Chapal for $360,000 (instead of the original $480,000 for 4000 lb.), on the condition that after Chapal contracts to buy Sugar's 10,000 lb. Harper would grade and sort Sugar's supply; Harper would also be allowed to keep 200 to 400 lb. of Sugar's supply.  Harper agreed to this compromise.

70.     House subsequently took a previously scheduled two-week trip to Alaska where he was only able to communicate by satellite text service.  Shortly before leaving, Lente and Elkins informed House that Elven Jennings held over 100,000 lb. of No. 8 Turquoise rough, which he was willing to sell for $5 per pound.

71.     Elkins asked for a commission to help Lente secure a deal with Jennings, which House agreed.  House instructed Lente to meet with Sugar and secure a deal to purchase his 10,000 lb.  He also instructed Lente and Elkins to set up a meeting with Jennings for Chapal to purchase his supply.

72.     Lente met with Paul Sugar and examined his supply.  Lente represented to House that Sugar's supply was "crap" and the he believed that it was "illegal" for Sugar to sell his supply because of the previous lawsuit brought by Jennings.

73.     While in Alaska, House contacted Lente regarding the potential purchase of Jennings' supply, Lente advised House that Jennings wanted to meet and sell his No. 8 material to Chapal as soon as House returned from Alaska.  While still in Alaska, House pushed for the date and place of the meeting with Jennings.  Despite repeated texts, Lente did not respond for several days.

74.     Eventually, House was able to contact Elkins and Lente regarding Jennings's supply as they were purportedly driving from their meeting with Jennings.  When House asked about the meeting, Elkins told House, "I bought the deal!"

75.     Upon information and belief, Elkins and Lente hid the fact that Steve Harper was in the vehicle with them when Elkins told House that he had personally bought Jennings's supply.

76.     Upon information and belief, Steve Harper, Elkins, Lente and an undisclosed investor formed No. 8 Mine, LLC and #8 LLC to jointly own and sell the No. 8 Turquoise that Lente and Elkins had agreed to negotiate and purchase on behalf of Chapal.

77.     Indeed, following House's return from Alaska, Lente refused to return Chapal's phone calls for several days despite receiving tens of thousands of dollars in previous payments and Lente's possession of over 6000 lb. of prepaid rough material.

78.     On or about May 25, 2017, House travelled to Gallup to meet with Lente and examine the 6000 lb. of rough material.  When House confronted Lente regarding his lack of responsiveness, Lente assured House that he would thereafter dutifully perform his responsibilities to Chapal.

79.     The following day, House met with Lente and Steve Harper at Lente's residence. House stated to Steve Harper his disenchantment over Lente's and Elkins' handling of the Jenkins deal.  In response, Harper advised House "to move on" because the deal was done. Steve Harper omitted his involvement in the Jennings deal.

80.     Throughout the month of June and despite being paid for his services and expenses, Lente again refused to return phone calls to Chapal employees regarding pending orders for material needed to satisfy time sensitive orders to Evine—one of Chapal's largest and most important customers.  Not only did Lente fail to communicate to Chapal, but Lente was extremely dilatory and outright failed to deliver materials that Chapal had already paid for, causing Chapal to lose orders and be repeatedly penalized by one of its largest customers.

81.     On June 26, House along with a Chapal employee met at Lente's residence to again record and inventory the Chapal material that Lente had procured and held.

82.     On June 30, House with the employee met with Paul Sugar and his father Paul Sugar, Sr.  The Sugars agreed to sell the Sugar inventory to Chapal on the condition of an indemnity agreement from Chapal should a dispute arise.

83.     On June 30, House and the employee met Lente at his residence to retrieve 6000 lb. of various opaque rough previously paid for by Chapal.  Chapal's employee weighed each bucket of material in the presence of Lente, while Lente described the contents of each bucket of material.  The weights and descriptions from Lente were dutifully recorded by the employee in the presence of Lente.

84.      Lente informed House that there was material at Elkins compound that was just coming out of stabilization but that Elkins would not release the material to Lente unless House paid for the stabilization.  Lente advised that the material was the balance of the material from the Baja.  House said that he would pay Elkins directly and pick up the material himself.

85.     House told Lente that based on his prior actions, his services were no longer required.

86.     On or about June 31, House met with Steve Harper and asked if he would still honor Chapal's $360,000 purchase agreement now that House had secured Sugar's agreement to sell his supply to Chapal.  Steve Harper was nonresponsive and noncommittal.

87.     House also advised Harper that Lente was no longer working with Chapal.

88.     On July 17, House and the Chapal employee traveled to Elkins's business in Grants, New Mexico to pay for the stabilization and pick up the balance of the material from Baja Mexico.  Elkins advised House that the Baja material had been picked up by Lente.

89.     Elkins provided House and the employee a tour of his compound.

90.     While at Elkins' facility, House and the employee observed trays of turquoise and other material very similar to what Chapal had purchased.  However, the material had been placed in drying trays labeled JE/FL (*i.e.*, Jackie Elkins and Frank Lente) and other trays labeled No. 8 LLC.

91.     House asked about the labeled trays and Elkins told him that Lente had supplied this material as part of a separate deal with Elkins.

92.     On July 29, House and the employee traveled to Lente's residence to pick up the material that Elkins and Lente had previously identified as the balance of the Baja material.  In addition to the material from the Baja and, much to House's surprise, there were four buckets of turquoise material that Lente identified as the balance of the material purchased from a Max Gonzalez.

93.     After taking possession of the turquois, House discovered that Lente had stolen the material Chapal had purchased and replaced it with inferior material.  Specifically, House sent the seller, Max Gonzalez, pictures of the blue turquoise that Lente identified as being from Gonzalez.  After reviewing the picture, Gonzalez informed House that that was not the blue turquoise Gonzalez had sold Chapal, but appeared to be worthless rice sized turquoise.

94.     House also discovered that the campitos Chapal purchased had been replaced with low grade tyrone.

95.     In sum, Lente and Elkins stole thousands of dollars of rough material purchased by Chapal and replaced it with inferior material.

96.     Steve Harper and Stoneweaver engaged in a classic bait and switch.  Specifically, Harper added to his original 2000 lb. offer by purchasing or "finding" low quality No. 8 rough, then doubling the original amount to 4000 lb., then skimming or otherwise withholding the best

turquoise for himself, while falsely representing in February that he was selling Chapal his entire "select" supply.

97.     Upon information and belief, Steve Harper, Lente, and Elkins also met with Sugar and convinced him to forgo his agreement to sell his supply of No. 8 Turquoise to Chapal and instead enter into an agreement to sell his supply to Steve Harper, Lente, Elkins and their companies, No. 8 LLC and #8 LLC.

98.     Throughout the months of June and July, Bryan Harper, working on behalf of his father and Stoneweaver, also solicited an executive at Chapal.  Bryan Harper told him that undisclosed business associates were attempting to close a deal to manufacture jewelry for sale to Chapal's wholesale customer, Evine.

99.     Bryan Harper asked the Chapal executive if he could arrange the sale of Bryan Harper's turquoise and opaque stone jewelry from the Thailand factory that manufactured jewelry solely for Chapal. Bryan Harper's business associates would bypass Chapal and purchase the jewelry directly from the manufacturer. Bryan Harper stated that one of his business associates would distribute the jewelry to Evine.

100.     Bryan Harper communicated that he wanted to cut Chapal out of the deal and have Chapal's executive take over the Thailand factory to perform the manufacturing with the No. 8 Turquoise supply that had been usurped from Chapal through the actions of Steve Harper, Lente, and Elkins.  Bryan Harper explained that the factory had already produced designs that were successful for Evine and asked if the Thailand factory would provide the same designs to his business associates working for Evine.

101.    The request was made knowing full well that Chapal had paid for the designs as well as the tooling used by the factory to make the jewelry and that the designs were proprietary to Chapal.

102.    House contacted Steve Harper and told him that his son must stop contacting Chapal's executive.  Steve Harper agreed, but the calls to the executive continued for a period of time after Harper agreed.

103.    After fraudulently inducing Chapal's purchase, delivering to Chapal subgrade, unusable material, failing to timely deliver pre-purchased material, withholding high grade material for themselves, and conspiring with Chapal's agent to usurp prospective contracts, Steve Harper and Stoneweaver sent House a demand letter for payment for the remaining balance of No. 8 Turquoise.

104.    Chapal owes no amount to Stoneweaver because of its prior material breaches, including, but not limited to, its failure to deliver high quality No. 8 Turquoise as promised, its failure to deliver 1200 lb. of material when requested, and its interference with Chapal's agreement with Paul Sugar.

<u>**COUNT I**</u>
(Breach of Contract—Against Stoneweaver)

105.    Chapal restates the allegations set forth in paragraphs 1 to 104.

106.    Pursuant to New Mexico law, Chapal and Stoneweaver entered into a valid enforceable contract in which Chapal purchased at least $240,000 worth of select, high quality No. 8 Turquoise from Stoneweaver.

107.    Despite Chapal's payment, Stoneweaver breached the parties' agreement by (1) refusing to hand over 1200 lb. of No. 8 Turquoise and (2) delivering 800 lb. of low quality or unusable No. 8 Turquoise rough.

16

108.     In addition, Stoneweaver breached Chapal's settlement agreement to purchase its entire supply for $360,000 by deliberately interfering with its purchase of Paul Sugar's supply of No. 8 Turquoise.

109.     As a result of Stoneweaver's breach, Chapal has suffered actual damages in excess of $240,000, consequential lost profit damages, and pre- and post-judgment interest in an amount to be determined at trial.

110.     Alternatively, Chapal seeks an order from the Court declaring the contract void or voidable, and an order requiring the return of Chapal's $240,000 payment to Stoneweaver.

## COUNT II
(Breach of Contract—Against Frank Lente d/b/a Wild Horse)

111.     Chapal restates the allegations set forth in paragraphs 1 to 110.

112.     Pursuant to New Mexico law, Chapal and Frank Lente entered into a valid enforceable contract in which Frank Lente agreed to use his expertise and to work exclusively as Chapal's agent locating and negotiating the purchase of the best opaque materials at the best price on behalf of Chapal.

113.     Despite Chapal's payments to him, Frank Lente breached the agreement by negotiating purchases on behalf of himself and others.  Lente also failed to represent Chapal's interests by inducing Chapal's purchase of overpriced and subgrade materials from his business consociates, and by stealing material purchased and owned by Chapal for himself and others.

114.     As a result of Lente's breach, Chapal suffered and seeks to recover its actual damages, consequential lost profit damages, disgorgement of Lente's profits, and pre- and post-judgment interest in an amount to be determined at trial.

## COUNT III
### (Breach of Implied Covenant Good Faith and Fair Dealing—Against Stoneweaver)

115.    Chapal restates the allegations set forth in paragraphs 1 to 114.

116.    Every contract, including Chapal's agreement to purchase Stoneweaver's entire supply of select, high quality No. 8 Turquoise, imposes upon the parties an obligation of good faith and fair dealing.

117.    Stoneweaver breached its duty of good faith and fair dealing and exercised its rights under the parties' agreement in bad faith by, *inter alia*:

> a.    adding inferior, subgrade material to its original quote of 2000 lb. of No. 8 Turquoise;
>
> b.    supplying 800 lb. of inferior, subgrade and worthless material;
>
> c.    deliberately misstating the amount of its entire supply,
>
> d.    failing to deliver material upon request;
>
> e.    withholding the best quality No. 8 Turquoise; and
>
> f.    securing an overpriced sales amount for subgrade material by subverting the loyalty of Chapal's negotiating agent, Lente.

118.    Stoneweaver's breaches and other misconduct were made with the goal, purpose and objective of depriving Chapal of the benefit of its agreement, and Chapal's right to an arm's length negotiation for the value of materials purchased.

119.    As a direct and proximate result of Stoneweaver's breach of the covenant of good faith and fair dealing, Chapal has suffered and will continue to suffer actual and consequential damages which are likely irreparable.

120.    Specifically, Chapel has no adequate remedy at law because (1) according to Stoneweaver's owner, Stephen Harper, it cannot repay Chapal's damages; and (2) as a result of

the removing, selling, or disposing of the high quality No. 8 Turquoise that cannot be substituted for other material.

121.    As a result of Stoneweaver's breach, Chapal has suffered actual damages, consequential lost profit damages, and pre- and post-judgment interest in an amount to be determined at trial.

## COUNT IV
(Fraud and Fraudulent Inducement of Contract—Against Harper, Stoneweaver, and Lente)

122.    Chapal restates the allegations set forth in paragraphs 1 to 121.

123.    Stephen Harper, Stoneweaver, and Lente made representations concerning Chapal's purchase of Stoneweaver's entire supply of No. 8 Turquoise.  Specifically, Stephen Harper, Stoneweaver, and Lente misrepresented the specific No. 8 Turquoise material being sold, the amount of high quality No. 8 Turquoise being sold, the purported high quality of the No. 8 Turquoise being sold, hid the long held business relationship between Stephen Harper, Stoneweaver, and Lente, and actively misrepresented Lente's loyalty to Chapal.

124.    These false promises, false representations, and omissions of material facts were made to induce Chapal into entering into its agreement with Stoneweaver and Lente.  Chapal would not have entered into and paid Stoneweaver and Lente if Chapal had known that Stephen Harper, Stoneweaver, and Lente misrepresented the specific No. 8 Turquoise material being sold, the amount of high quality No. 8 Turquoise being sold, the purported high quality of the No. 8 Turquoise being sold, their long held business relationship between Stephen Harper, Stoneweaver, and Lente, and actively misrepresented Lente's loyalty to Chapal.

125.    As a direct result of Stephen Harper's, Stoneweaver's, and Lente's misrepresentations, Chapal suffered and seeks to recover its actual damages, consequential lost

profit damages, disgorgement of Stephen Harper's, Stoneweaver's, and Lente's profits, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

**COUNT V**
(Fraud—Against Elkins and Lente)

126.    Chapal restates the allegations set forth in paragraphs 1 to 125.

127.    Elkins and Lente made false representations concerning the source of and/or the nature of the material delivered to Chapal.

128.    Specifically, Elkins and Lente represented that they were delivering to Chapal campitos when, in fact, the campitos had been replaced with low grade tyrone. In addition, they delivered four buckets of turquoise material that was identified as the balance of blue turquois purchased from Max Gonzalez, when in fact, Elkins and Lente had replaced that material with inferior, subgrade material.

129.    Elkins and Lente knew these representations were false and were made with the intent of Chapal taking inferior material. Chapal relied on the representations of Elkins and Lente which resulted in harm to Chapal.

130.    As a direct result of Elkins's and Lente's misrepresentations, Chapal suffered and seeks to recover its actual damages, disgorgement of Elkins's and Lente's profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

**COUNT VI**
(Conversion—Against Lente and Elkins)

131.    Chapal restates the allegations set forth in paragraphs 1 to 130.

132.    Chapal owned and had a right to immediate possession of campitos and turquoise in the possession of Lente and Elkins.

20

133.    Lente and Elkins wrongfully exercised control of Chapal's personal property by taking Chapal's property and replacing it with inferior material.

134.    As a direct result of Lente's and Elkins's acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of Lente's and Elkins's profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

## COUNT VII
(Breach of Fiduciary Duty—Against Lente)

135.    Chapal restates the allegations set forth in paragraphs 1 to 134.

136.    Lente agreed to act as Chapal's exclusive agent for locating and negotiating the purchase of opaque material on behalf of Chapal.  Lente breached his fiduciary duty of loyalty, utmost good faith, duty to refrain from self-dealing, fair, honest dealing, and full disclosure.

137.    Lente breached his fiduciary duty to Chapal by (i) failing to disclose his long time business dealings with Steve Harper, (ii) negotiating deals on behalf of himself, Steve Harper, Stoneweaver, No. 8 LLC. and #8 LLC, while being paid by Chapal to represent its interests, (iii) representing to Chapal that he was working on its behalf to secure transactions, including, but not limited to, the Baja Mexico, Paul Sugar, and Jennings transactions, while instead working to secure transactions for himself, Steve Harper, Stoneweaver, No. 8 LLC. and #8 LLC, (iv) unlawfully taking property belonging to Chapal for himself or others, (v) disclosure of Chapal's confidential trade secrets and proprietary information to third parties, and (vi) failing to loyally and faithfully negotiate the purchase price of opaque materials on behalf of Chapal, including, but not limited to, Chapal's purchase of No. 8 Turquoise from Steve Harper and Stoneweaver.

138.     Lente's breaches resulted in harm to Chapal, in the form of overpayment to Stoneweaver and other opaque stone suppliers, lost purchase and investment opportunities, and lost profits.  Lente's breaches also resulted in unjust benefits and profits to Lente personally.

139.     As a direct result of Lente's acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of Lente's profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

**COUNT VIII**
(Conspiracy—Against All Defendants)

140.     Chapal restates the allegations set forth in paragraphs 1 to 139.

141.     Steve Harper, Stoneweaver, Lente, Elkins and their companies No. 8 LLC and #8 LLC conspired in Lente's breach of his fiduciary duties to Chapal by, *inter alia*, their usurping of Chapal's business opportunities, defrauding Chapal by delivering and/or attempting to deliver subgrade No. 8 Turquoise to Chapal that they represented as "high quality" and "hand selected," by interfering with Chapal's contract with Paul Sugar and prospective business relationship with Jennings, and misappropriating Chapal's confidential and proprietary trade secrets to usurp its business with Evine.

142.     Steve Harper, Stoneweaver, Lente, Elkins and their companies No. 8 LLC and #8 LLC had a meeting of the minds to commit the foregoing unlawful acts, and one and/or each member of the conspiracy committed unlawful, overt acts to further their joint unlawful objectives.

143.     As a direct result of their acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of their profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

<u>**COUNT IX**</u>
(Misappropriation of Trade Secrets—Against All Defendants)

144.  Chapal restates the allegations set forth in paragraphs 1 to 143.

145.  Chapal possessed trade secret information concerning its ongoing plans to create a special brand and to feature No. 8 Turquoise for its wholesale customers, such as Evine, as well as its confidential contacts with such wholesale buyers and their agents and salesmen.  Such information concerning Chapal's plans were given in confidence to its exclusive agent, Lente.

146.  Lente violated his duty to keep such information confidential by disclosing such information to Steve Harper, Stoneweaver, Elkins, No. 8 LLC, #8 LLC and other third parties. Lente Steve Harper, Stoneweaver, Elkins, No. 8 LLC, and #8 LLC then used Chapal's confidential information for their own benefit to secure business with Chapal's wholesale buyers, including, upon information and belief, Evine.

147.  As a direct result of Defendants' acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of Defendants' profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

<u>**COUNT X**</u>
(Violation of the New Mexico Unfair Practices Act, § 57-12-1, et seq.—Against All Defendants)

148.  Chapal restates the allegations set forth in paragraphs 1 to 147.

149.  As set forth above, Defendants do business in New Mexico, and are subject to the laws of the State of New Mexico.

150.  Defendants knowingly, willfully, and in bad faith, misrepresented (1) the quality, sources, and/or nature of the opaque material being sold to Chapal, (2) that the opaque materials sold or delivered to Chapal had a particular high quality or grade, (3) that the opaque materials

sold or delivered to Chapal had certain usable quantities of opaque minerals, (4) the availability or scarcity of No. 8 Turquoise for sale, (5) statements of fact concerning the market price of No. 8 Turquoise, and (6) that Defendants had provided an expert service in selecting, grading, and/or stabilizing the opaque material.

151.    In addition, Defendants have systematically withheld and replaced opaque material purchased by Chapal with subgrade, inferior material and Chapal has no way of confirming that any future material delivered to it represents the specific material or quality of material it originally agreed to purchase.

152.    Defendants have also indicated they do not have funds to return payments made to them.

153.    Accordingly, Defendants have violated the New Mexico Unfair Practices Act, § 57-12-1, et seq.

154.    As a direct and proximate result of Defendants' statutory violations, Chapal has suffered and will continue to suffer irreparable harm.

155.    Chapal has no adequate remedy at law.

156.    Accordingly, Chapal requests injunctive relief enjoining Defendants from selling any of their rough material until Chapal receives the quantity and quality of opaque material it bargained for.

157.    As a result of Defendants' statutory violations, Chapal has suffered damages for which it is entitled to compensatory damages from Defendants in an amount to be determined at trial.

158.    Chapal is also entitled under the statute to attorney's fees and treble damages.

## COUNT XI

(Tortious Interference with Contract—Against All Defendants)

159.    Chapal restates the allegations set forth in paragraphs 1 to 158.

160.    Chapal entered into a valid contract with Paul Sugar to purchase his supply of No. 8 Turquoise.

161.    Defendants willfully and intentionally interfered with Chapal's contract with Paul Sugar by, *inter alia*, falsely representing that it was illegal for him to sell his supply and engaging in self-dealing in breach of their fiduciary and/or contractual duties of good faith owed to Chapal.

162.    As a direct result of Defendants' acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of Defendants' profits, consequential lost profit damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

## COUNT XII

(Tortious Interference with Prospective Business Relationship—Against All Defendants)

163.    Chapal restates the allegations set forth in paragraphs 1 to 162.

164.    Chapal had a reasonable probability of entering into a business transaction with Paul Sugar and Elven Jennings to purchase their supplies of No. 8 Turquoise.

165.    Defendants intentionally interfered with the potential relationship through fraud, breaches of fiduciary duty, and/or conspiracy to commit such tortious acts.

166.    As a direct result of Defendants' acts and omissions, Chapal suffered and seeks to recover its actual damages, disgorgement of Defendants' profits, consequential lost profit

damages, punitive damages, and pre- and post-judgment interest in an amount to be determined at trial.

## COUNT XIII
### (Negligent Misrepresentation—Against Steve Harper, Stoneweaver, and Lente)

167.     Chapal restates the allegations set forth in paragraphs 1 to 166.

168.     Alternatively, Steve Harper, Stoneweaver, and Lente grossly misrepresented that Stoneweaver had a total supply of 4000 lb. of "high quality, hand selected" No. 8 Turquoise suitable for jewelry production.

169.     These Defendants also represented that No. 8 Turquoise was limited in quantity and availability.

170.     In justifiable reliance on these representations, Chapal agreed to purchase Stoneweaver's entire supply.

171.     These Defendants did not exercise reasonable care or competence in obtaining or communicating the source, quality, or quantity of Stoneweaver's supply.

172.     As a direct result of Defendants' acts and omissions, Chapal suffered and seeks to recover its actual damages and exemplary damages for Defendants' gross conduct, plus pre- and post-judgment interest in an amount to be determined at trial.

**WHEREFORE,** Chapal respectfully requests that the Court enter a judgment against all Defendants, where applicable, as follows:

A.     Awarding, Chapal actual and consequential damages;

B.     Awarding Chapal punitive damages;

C.     Awarding Chapal pre- and post-judgment interest;

D.     Awarding Chapal attorney's fees;

E.     Awarding Chapal costs of court;

F.      Enjoining Defendants from selling any type of material which Chapal purchased or owns for the duration of this litigation; and

G.      Grant Chapal other and further relief to which Chapal may be justly entitled.

**PLAINTIFF SPECIFICALLY REQUESTS A TRIAL BY JURY ON ALL TRIABLE ISSUES.**

Respectfully submitted,

**SAUCEDOCHAVEZ, P.C.**

By:  _/s/ Christopher T. Saucedo_
         Christopher T. Saucedo
New Mexico State Bar No: 10578
Post Office Box 30046
Albuquerque, NM 87190
Ph: (505) 338-3945
EM:  csaucedo@saucedochavez.com

and

Cory C. Johnson (application pending)
Texas Bar No. 24046162
**Law Office of Cory Johnson**
3102 Maple Ave. Suite 400
Dallas, Texas 75201
Ph: 214.450.5280
EM: cory@johnson-esq.com

*Attorneys for Plaintiff Chapal Zenray, Inc.*